Case No. 4 for argument today is United States v. Balsiger Mr. Leeper. May it please the court. My name is John Leeper. I'm from El Paso, Texas, and I represent Thomas C. Balsiger. I want to start with the insufficiency of the evidence, Your Honors. As a preliminary matter, a defendant does not need to make a Rule 29 motion in a bench trial to preserve the usual standard of review for sufficiency of the evidence on a claim on appeal. With that being said, Your Honor, no rational trier of fact could have found Mr. Balsiger beyond a reasonable doubt of executing a scheme to defraud manufacturers represented by CMS on dates between November 2002 and February 2003 based solely on an outdated contract that related to an archaic method, an obsolete method of processing coupons. In this case, Your Honor, the court found Mr. Balsiger not guilty. Representing himself, they found him not guilty. The court found him not guilty of counts 1 through 15, all the counts involving the coupons processed with NCH because IOS's two-step contract with NCH, this one-page document, did not require that IOS provide physical store tags identifying where the coupons had been redeemed. In a fraud case, I have a hard time seeing how the terms and conditions of the contract are relevant, especially after the fact with the standard review here on a sufficiency of evidence. Your Honor, there's no doubt in my mind that this case was decided entirely on the basis of these two contracts, one of which was void. There was only one scheme proven or articulated by the government and the witnesses, one scheme, and that scheme involved physical store tags. All of the evidence applied to both NCH and CMS. The government didn't put on a scheme to defraud CMS and a different scheme to defraud NCH. The evidence was the same. The court found him not guilty on NCH because of the contract, because it did not require store tags, and found him guilty on the others because it did require store tags. And the court made the basis for its holding crystal clear. You have no reasons for its verdict. No, sir, not at the verdict. I think you're referring to just the comments made in the sentencing. Yes, sir, I am. But the sentencing mirrored exactly what happened with the verdict. In other words, at sentencing, the court— Let me ask my question a different way. If the trial judge fully credited the testimony of the representatives of S.C. Johnson, and how do you say it, LeSafree Yeast? Yes, sir. Okay. If the trial judge fully credited that testimony, as well as that of Steve Furr, doesn't that show fraud? No, sir, not at all. How can you say that? Because there was no scheme to defraud any manufacturer. The contract with NCH did not require store tags, so they did not—IOS did not provide store tags. The contract with CMS did require store tags, but that's not how they were processing coupons with CMS at the relevant time. They were using one-step processing, which would not allow diversion. So there was no scheme to defraud anybody. The court agreed that iOS did not have to provide store identity to NCH. What the court did wrong was it relied on an outdated, void contract to determine iOS's obligations at a time when it was using an entirely different method of processing coupons. There were no physical store tags with one-step processing. In two-step processing, the coupons came in, they were counted, iOS paid the stores for those coupons, attached a physical store tag. The coupons were then sent to the redemption agent, who then counted the coupons again, and then paid iOS. In the one-step processing, there was no physical store tags. The two processes were combined. Store identity was sent electronically to the redemption agent, and the coupons had to be sent immediately thereafter or within a day or two after. I guess I have a hard time seeing what difference any of that makes in a case where facts were showing that coupons were being tendered in circumstances where they could not have been redeemed at merchant stores. I don't follow your—that's not the—there's no evidence that these coupons could not have— in other words, the diversion— They could not have been, right? They were real coupons. Yes, sir, and redeemed. The diversion was simply taking them, and rather than submitting them under the true name of this small store, which manufacturers didn't want to pay. They didn't want to pay, and they could not pay because there was no recourse that the small store had against the manufacturer. On the other hand, manufacturers paid the big stores because there was recourse, and there was things that they could do. The White Knight Project proved—in other words, they went out and used, I don't know, 100 coupons at a store, and then submitted them for payment, and 70% of those coupons got rejected for no reason. They had been used. Mr. Balsher was trying to get paid, so he sent the coupons from Juarez to Acuna. Those coupons were then put into coupons submitted by big stores and then submitted for payment, and that did reduce the chargeback rate, and there was nothing fraudulent about it because IOS—NCH's one-page contract said nothing about store coupons. It didn't address—I mean, store tags. It didn't address that whatsoever. The court relied on the two-step contract with CMS to determine its obligations at a time when it was not using two-step processing. That two-step contract was replaced by this 35-page contract with all sorts of schedules and details. It's a completely different method of processing coupons. There was no fraud. NCH didn't require store identity, and IOS didn't give it to them. And there's no evidence, Your Honor, there's no evidence anywhere of a scheme to defraud under one-step processing. No witness described some way to manipulate the data, change things around, and falsify things in one-step processing. As a result, there was no diversion in one-step processing. I thought Mr. Fuhrer pretty plainly testified that the funds went to CMS. Okay, let me address that. Your Honor, Mr. Fuhrer did not. The government, in about a one-paragraph leading question, said, did you come to find out that CMS was also being diverted? The only thing that Mr. Fuhrer said was the word yes. That's the only thing that he said. Well, that's evidence. Well, that's a leading question to their own witness, Your Honor. And Mr. Balser, you're sitting there representing himself pro se, didn't think to object. He didn't know to object to that leading question. And, Your Honor, if I may, what the government is trying to say is because Steve Fuhrer was aware of a problem with Quaker Oats, and Quaker Oats was a CMS client, then that has to mean that it applied to CMS as well. What the government conveniently leaves out is the timing of that complaint with Quaker Oats, which was in the year 2000, before iOS entered into a two-step contract with CMS. Mr. Fuhrer did not testify that somehow it included it. He said the word yes, and that's it. And, Your Honor, all of his prior testimony defeated that. His prior testimony was they used one-step processing from 2000 through 2005. He testified that with one-step processing, there were no physical score tags. If you could move back to the middle of the… I'm sorry. I apologize. Unfortunately, the recording seems to go together with the amplification, which causes a problem. But we do need the proceedings recorded as well. Yes, sir. Your Honor, the testimony was that Mr. Fuhrer told Mr. Balsiger at the very first meeting in April of 2000, diversion will not work with CMS because they're on one-step processing. The government wants this court to believe that Mr. Balsiger knew it wouldn't work, Mr. Fuhrer knew it wouldn't work, OV Enriquez knew it wouldn't work, but they went ahead and did it anyway. I don't want you to consume all your time on this, because I want to ask you one question about the retention of counsel issue. Yes, sir. Do you agree Mr. Balsiger sold his home in February 2006? Doesn't the record show that? He did ultimately sell his home. I'm sorry, 2016. Doesn't the record show that? I believe that's correct, yes, sir. Was that brought to the district court's attention? I'm not sure if it was or not, Your Honor. In other words, Mr. Balsiger had the government… Because his point, as I understood it, was, I need that Liz Pendence lifted to sell the home because I need proceeds to retain counsel, Mr. Espers in particular. Yes, sir. Okay. Well, the home, in fact, looks to me like it was sold. But it was sold a year later, Your Honor. Well, it was sold in February of 2016, but we didn't have a trial until October. Your Honor, the die had been cast. Mr. Balsiger's Sixth Amendment rights were violated the day that he was deemed to have waived the right to counsel. The court gave him a constitutionally offensive ultimatum. You either hire counsel within 21 days who says he'll try the case in eight months or else you represent yourself. I know you say that. I understand that. But it is clear from the record, as I read it, that in May of 2015, the trial court was warning your client about the risks of going pro se and urging him to get counsel. Your Honor, I don't believe there's any colloquy whatsoever by the district court warning Mr. Balsiger about the disadvantages of representing himself pro se. I believe everybody, both parties, agreed there was no colloquy whatsoever. I mean, that's fair on no formal warning, but telling him in May of 2015, you can get counsel. Okay. First of all, the die had already been cast, Your Honor. His rights were violated back in January when the court gave the ultimatum. The court said either have an attorney or represent yourself. Mr. Balsiger asked, does that mean I have to have an attorney who's ready to go to trial on October the 26th of 2015? The court said unequivocally, that's right. You have to have an attorney at that date. So, Your Honor, what happened thereafter, I don't see how that unwinds the constitutional violation, and I don't believe that it unwinds the constitutional violation whatsoever. Well, it unwinds it in the sense that your claim is that he was effectively forced to trial pro se. Clearly. My point is that he had a lot of opportunities after the colloquy you're referring to to retain counsel. Your Honor, a decision was made after the deemed waiver. The violation was complete at that juncture. It's not his duty to unwind the violation caused by the court. What harm occurred to him that couldn't have been undone by bringing in new counsel? What harm occurred to him? That could not be undone by using his assets to bring in Mr. Esper or some other lawyer. Your Honor, he was not allowed to use his assets. He was told unequivocally, you can't use your assets, you cannot hire Mr. Esper, and you have to be ready. He was not told those things. I know that's your spin on it. Your Honor, he said, I am specifically denying your choice of Mr. Esper. Esper never entered an appearance, did he? He did not formally because Mr. Balsiger was told you cannot have Esper because he cannot be ready for trial on October 26, 2015. He was told you can't have him because he cannot be ready on time. Why would Mr. Balsiger hire him? That proved wildly counterfactual. The trial occurred in October of 2016. And, Your Honor, that proves how arbitrary and unreasonable the ultimatum given by the court was. You think it's arbitrary and unreasonable eight years into a criminal case to suggest that the case could be tried in six months? Yes, sir. In this particular case, I do. This case was pending eight years. It took the court three years to rule on his various motions. The privilege motions, the bill of particular motions, the motion to dismiss, those took over. I'm just stunned we don't have a speedy trial claim here. I'm actually stunned we didn't have a petition for mandamus by the prosecutor telling the district judge to get on with his job. Your Honor, that's not Mr. Balsiger's fault that this case was ongoing for eight months. The jury filed a lot of motions. Your Honor. It didn't seem to be anxious for trial. If I may address those motions, the government indicted IOS, the entity. Immediately thereafter, they were successful in getting IOS to waive its attorney-client privilege with regard to hundreds of thousands of documents in the possessions of three law firms. Mr. Balsiger legitimately claimed attorney-client privilege, work product privilege with regard to many of those documents. It took the court two if not three years to rule on them. And, Your Honor, the court ruled that hundreds of those documents were, in fact, privileged, including the Abigail Clapp memo that was front and center at trial. And now the government is trying to discount and run away from because, in it, Mr. Balsiger admitted diverting coupons with NCH but denied diverting coupons with CMS. Mr. Balsiger's – excuse me, Mr. Abraham filed meritorious actions on behalf of Mr. Balsiger. The government could have gone – the government got an indictment without those documents. The government – Thank you. I'm sorry. Mr. Froehlich. May it please the court. Good morning, Your Honors. We're asking that the court affirm Mr. Balsiger's convictions and sentence, all of which stem from his long-running and extensive fraud scheme, related conspiracy, and relentless effort to obstruct the investigation and prosecution. The court asked about the delay, pointed out the delay. It was extremely frustrating to the government, the victims, and the witnesses, especially the witnesses who are the target of intimidation efforts by Mr. Balsiger. In terms of those delays, we would be loath to mandamus the district court on such an issue, but it was very frustrating. And the delays were Mr. Balsiger's fault, the fault of Mr. – Can I ask a question that will at least help me think about the evidence here? Sure. You had a ringside view to all this. On the basis of the evidence that was presented at trial, how do you make sense out of the verdict? Sure. When you came back. Yeah. I can make sense in a couple of different ways, some of which require – well, all of which require speculation as we don't know what the judge had in mind. Neither party asked for specific factual findings. I'm puzzled by that. I'm sorry. I don't want to interrupt your answer, but the rule says he has to get findings of fact. If either party – Affirmatively waive them? I believe the rule is if either party requests, the court has to, and neither party requested here. All right. Sorry. Sorry. What sense can you make of the verdict? I can make the sense in a couple of ways. Obviously, the court realizes we disagreed with that and presented evidence in our view that established the scheme applied to clients represented by both manufacturers' agents. If the court is asking me to speculate as to what the court may have had in mind, I'm happy to do that. There had been a lot of finger-pointing and saying it was all NCH, it was all NCH. This is just a business dispute. It's a contract matter. We're fighting with NCH, NCH, NCH. Their contract is different, Your Honor, is what Mr. Balsker kept saying. Look, they don't want this specific store information. And that's when the contracts were the center of his defense. It is possible, again, I don't think it's necessary or in the record for this appeal, that the court simply wanted to remove the NCH issue from the equation, given what was going on, and knock those issues out for appeal. I can't speak otherwise to what the district court may have been thinking in that regard. But what I can tell the court is that there was sufficient evidence to convict Mr. Balsker on all the counts of conviction. Mr. Leeper, both this morning in response to Judge Scudder's questions and in the brief, pitched the scheme as, oh, this is just simply physically removing store tags from batches of coupons. That's it, and that's why there was no fraud as to CMS clients. But that's not what the scheme was, as hopefully is clear from the briefs. IOS had two sets of coupons, if we want to simplify it. Coupons in its rapid pay program that it knew were likely to be rejected, and which the district court ultimately found the bulk of which had never been even used at a store. They have coupons they know are going to be rejected, and coupons they know almost never get rejected from large retail chains. And so what IOS decided to do, in Mr. Balsker's direction to make money, was to take those coupons it knew would not get paid, lie about them, provide false store and retailer information to manufacturers, and get them paid. It was as simple as that. Now, there was a step in that for some coupons where internally they removed store tags that they had attached themselves before providing false information out to the manufacturer. That's just one small logistical step. They did other things, too, including altering the appearance of these coupons, first in canvas carts and then in the cement mixer, as we pointed out. With respect to those lines, can you explain the term gang cut? Sure. Gang cut would simply be just taking a whole stack and cutting them all at once with a paper cutter. So a cutter could take a group of Sunday inserts from the paper, they're all the same, line up ten sheets that are the same, and cut them all at once and save time. So that's gang cut. Mass cut goes hand-in-hand with mint condition. And so that's what they were doing, was altering the appearance to make sure that these coupons got through. And the court heard testimony from nine IOS employees, from executive to plant manager, about what they were doing. Additional evidence from others who became aware of it when working with IOS and evidence from witnesses who described the fraudulent nature of the rapid pay submissions. The plant folks, Steve Furr as well, Carrie Costello, Peggy Fife, cutters like Jose Almonte, and going on. My point is that the rapid pay coupons, cut in bulk or not, and mangled or not, were diverted to the large retailers or batched with the large retail coupons, paid at a higher rate of frequency than they otherwise would have been paid. That that was knowing and purposeful, and that he was skimming off the top of those proceeds? Is that the scheme in essence? In essence, yes, but it wasn't skimming those proceeds. They were skimming from their clients as well, but generating those proceeds from that. They were actually paying for these coupons up front, and they called their funded programs. So they would pay them, okay, retailer, we're taking these in. We're going to pay you, and we'll reconcile it later. And that way the retailer doesn't even know what's being billed out in its name, both from the small store and the big store perspective, and then just keeping the money when it came in. And that's really what it was. With respect to the contract, that does not wipe out the sufficiency of the evidence when viewed in the light most favorable to the government. This is a fraud case, as Judge Scudder pointed out, not a contract case. And we addressed the speculation as to what Judge Clavert may have had in mind when rendering his verdict. But what we do know on that is post-sentencing, Mr. Balsiger filed a motion entitled the Rule 35 motion. Procedurally it wasn't appropriate, so the court didn't reach the merits. But in that motion, he asserted that this one-step contract was the basis for your conviction of me, Your Honor. There couldn't have been loss because of it, and made the same argument he makes today. Judge Clavert, again, didn't reach the merits of that, but noted that Mr. Balsiger's claim was, quote, contradicted by other evidence in the case. So he had an opportunity to present it. Judge Clavert could have found a way to weigh in at that point, but found that Mr. Balsiger's claim was contradicted by other evidence, which, in fact, it was. The court addressed the Steve Furr questioning with Mr. Leeper this morning, and submit that even if the question of did there come a point were to be considered leading, Judge Clavert certainly could figure out whether I was testifying as the person asking the question or whether the witness who was sitting in front of him was providing that information. And, again, that's only one piece of the evidence about it not being limited in the manner that Mr. Leeper claims. The court had additional testimony from Dave Howard, who ran the plant to which the coupons were diverted, the plant that billed out the large client coupons. These small-star coupons came in in Juarez, Mexico. The diversion was that IOS physically moved them hundreds of miles away to bill them out as the large-store coupons, and the person in charge of receiving them and billing them out with the false information on them, Dave Howard, testified, I couldn't limit that to any particular manufacturer. I'm billing by retailer, so I have a large retail chain's coupons on the line. I'm dumping these coupons from Juarez that are coming in in with those coupons. I'm not controlling it by if it's going to a CMS client, an NCH client, Procter & Gamble, which uses itself, doesn't have an agent. I'm doing this by retailer, so I couldn't limit this in any way, as Mr. Balsiger says. I also had testimony from Carrie Costello that it wasn't limited, and, in fact, she describes an example of Procter & Gamble dealing with issues caused by the scheme and talked about other disputes caused by the scheme, which were outlined in Exhibit 17. Mr. Leeper is right. We did make issue of a Quaker Oats issue. It would encourage the court, should it have interest, to look at Exhibit 37, which is the correspondence back and forth between Quaker Oats and IOS about these. Quaker says, and Mr. Leeper's right, that's related to coupons in 2000, and that's when the scheme and diversion started, April of 2000, a year before this one-step contract even came into being. So the scheme was up and running. In fact, the audit records show $49 million in diverted coupons just in 2000. But those Quaker Oats going back and forth say, listen, these are from CVS, purportedly redeemed at CVS, one of your clients, IOS. CVS is a client that we trust because we have no misredemption issues in the past. They're on a pay claim, meaning they say they got these coupons, we pay it. We don't hassle with them. And we look at this, and we're seeing all these issues, and we're seeing things like coupon redemption rates at 115% of the volume of product they bought, or coupons, 50,000 coupons being redeemed for product they don't carry. What is going on? And so they're looking at this, and what's really interesting, if you want to drill down into the details, is they specify which IOS invoices they're talking about, and they all start with an 8. And there was witness testimony that explained that's how IOS initially tracked the fraud, how they tracked the diverted coupons is they used invoice numbers starting with 8 or 9, which were outside the normal sequence of events. So the witnesses explained, we know that the Quaker Oats incident was a result of the diversion. Can you address the forfeiture issue? Sure. We believe the district court properly found that Section 981A2A should apply to illegal goods or unlawful activities, and that gross proceeds is the correct measure. With respect to that, coupons are not a good with an inherent value. They only have value when redeemed by a customer or consumer who has purchased the product listed on the offer on the coupon, and the retailer complies with the manufacturer's redemption policy in terms. And it's interesting, in litigation before, and it's in the record in this case, the court could look at Record 815-2, which is something Mr. Balsiger submitted. Mr. Balsiger in IOS had previously said, these are payment intangibles or general intangibles under the UCC, which if the court looks are things other than goods. So Mr. Balsiger in IOS had taken the position they weren't goods. They had a right to payment, a payment intangible or general intangible, based on the compliance with the manufacturer's redemption policy. I would also note that what we're talking about here with respect to the forfeiture were simply gang cut or mass cut coupons. Judge Colvert specifically made a finding, this is Record 1019 at pages 49 and 50, that the bulk of the rapid pay coupons were gang cut and had never been used to purchase a product. So that's really what he started with is, okay, the bulk of these coupons that we're talking about were gang cut and had never been used. We know that IOS diverted $265 million worth of these coupons just in 2000 through 2003. So if I, the district court, assume that 50% of them had never been redeemed, that's $132.5 million, and then we'll apply Mr. Balsiger's ownership percentage from that. So in other words, we're only talking about coupons that had never been used and can have no value. So that's why, one of the reasons that we believe the district court was correct in using that subsection of the statute, Section 981A2A. Mr. Perling, can I direct you to the choice of counsel issue briefly? Yes, Your Honor. I gather there was no full-fledged Feretta-type colloquy here since he wasn't claiming a right to self-representation. But what's the strongest, what are the strongest indications in the record that we'll see that he was aware of the risks? Sure, sure. Judge Hamilton, you're correct. There wasn't a specific Feretta colloquy. There were a series of hearings at which the representation was addressed, and at each of those, the court explained what the consequences would be if Mr. Balsiger refused to retain new counsel. But if we look at the rest of the record, it shows that he did know of the risks. He indicated, and he explained this in his testimony, that this was his life. He was on trial for his life. He said that, I'm not waiving my right, realizing that the right was important. He claimed early on that the district court was violating his Sixth Amendment right and threatened an appeal, which would show he knows that it would be a bad move to go by himself. He again argued that the trial would be a waste of taxpayer money because of those errors. He had the supporters, as he explained, that his entire circle and his son were also attorneys. He used standby counsel, showing an appreciation of the difficulties of representing himself. He also had his background and experience. As he described himself, he's a litigious individual who thrives in litigation, and the court has both his testimony and his filings. For example, Record 643, where he talks about his prior experience retaining counsel. He's retained counsel from Jones Day and Greenberg-Traurig down to solo practitioners, and he knows that that's in the civil context, and he knows that the criminal stakes are much higher. And then, of course, we have his admission in May of 2015 that this was a strategic choice, a business decision. He was playing the odds, and he didn't want to moot the appeals that he had by retaining counsel. Thank you, Your Honor. Thank you, counsel. The case is taken under advisement.